**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MELCHOR GUEVARA,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

*Respondent.*

No. 08-72252

Agency No.
A075-498-425

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 2, 2010—Pasadena, California

Filed June 3, 2011

Before: Mary M. Schroeder, Raymond C. Fisher, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge Fisher

**COUNSEL**

Gary Finn, Indio, California, for petitioner Melchor Guevara.

Nairi M. Simonian, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for respondent Attorney General Holder.

**OPINION**

N.R. SMITH, Circuit Judge:

The grant of employment authorization, pending the approval of adjustment of status to that of a Legal Permanent Resident (LPR) under 8 U.S.C. § 1255, does not confer admission status on an undocumented alien (one who entered without inspection or authorization and has not otherwise been admitted) for purposes of calculating seven years of continuous residence under 8 U.S.C. § 1229b(a)(2). Employment authorization, under 8 C.F.R. § 274a.12(c), merely allows such alien the right to work while his or her application for adjustment of status is being adjudicated.

## I.  Factual Background

Melchor Guevara entered the United States without inspection in 1987. After entering the United States, Guevara began

living and continues to live with his LPR daughter and his two United States citizen grandchildren.

In October 1997, Guevara filed an application to adjust his status from that of an undocumented alien to an LPR under 8 U.S.C. § 1255(i) (after receiving an approved I-130). After filing his application, Guevara applied for and received his employment authorization in January 8, 1998. While his application for adjustment of status was pending, Guevara requested permission to temporarily leave the United States (i.e., advanced parole, 8 U.S.C. § 1182(d)(5)(A)); the request was denied on September 29, 1999. Thus, Guevara was required to stay in the United States pending the approval of his application for adjustment of status or risk forfeiting his application. On October 17, 2000, he was allowed to adjust his status to an LPR.

On September 17, 2006, Guevara attempted to assist another alien daughter and her child to enter the United States unlawfully. Because of that conduct, Guevara was served (on the same day) with a Notice to Appear in removal proceedings. The government charged him with knowingly assisting undocumented persons to enter the United States in violation of Immigration and Nationality Act (INA) § 212(a)(6)(E)(i), 8 U.S.C. § 1182(a)(6)(E)(i).

During Guevara's removal proceedings, he admitted to assisting his daughter and grandchild to illegally enter the United States. However, he also applied for cancellation of removal. The immigration judge (IJ) found that Guevara was eligible for cancellation of removal under INA § 240A (8 U.S.C. § 1229b). Specifically, the IJ found that Guevara met the seven-year requirement for cancellation of removal, because Guevara was granted the employment authorization on January 8, 1998 and lived in the United States continuously until the initiation of removal proceedings on September 17, 2006. The IJ held that, when the government granted Guevara the opportunity to work in the United States, he was

"admitted in any status." In making this decision, the IJ found Guevara's circumstances similar to those of participants in the Family Unity Program (FUP) and therefore applied the reasoning of *Garcia-Quintero v. Gonzales*, 455 F.3d 1006 (9th Cir. 2006), to Guevara. The IJ also noted that Guevara was denied advanced parole and thus required to remain in the United States.

The government appealed the IJ's ruling to the Board of Immigration Appeals (BIA). The BIA, in an unpublished decision, reversed the IJ's decision. The BIA rejected the IJ's conclusion that receiving an employment authorization document was comparable to being a participant in the FUP. The BIA found that "the holding in *Garcia-Quintero*, *supra*, involving an alien who was accepted into the FUP, does not extend to an alien who was simply granted an [employment authorization document]." The BIA further noted "we find the respondent's circumstances are distinct from a FUP beneficiary who is eligible to depart the United States and return pursuant to the FUP concept of 'voluntary departure.' " Instead, the BIA found Guevara ineligible for cancellation of removal, because he had not met his seven years of continuous residence, which it determined began on October 18, 2000,[1] the date Guevara's application for adjustment of status was approved.

## II.   Standard of Review

We review de novo "the BIA's determination of purely legal questions, including the BIA's interpretation of the Immigration and Nationality Act." *Lopez v. INS*, 184 F.3d 1097, 1099 (9th Cir. 1999). We apply *Chevron* deference to the Board's interpretations of ambiguous immigration statutes, if the Board's decision is a published decision. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir.

---

[1] There is an inconsistency in the record of whether Guevara's application for adjustment of status was granted on the 17th or 18th of October.

2009). However, we need not defer to the BIA if the statute is unambiguous. *See id.* at 908; *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). We follow "the *Skidmore* framework if the decision is unpublished (and not directly controlled by any published decision interpreting the same statute)." *Uppal v. Holder*, 605 F.3d 712, 714 (9th Cir. 2010) (citing *Marmolejo-Campos*, 558 F.3d at 909-11).

## III.   Discussion

**[1]** In order for Guevara, a legal permanent resident alien (who is inadmissible or deportable), to be eligible for cancellation of removal, he must meet the requirements set forth in 8 U.S.C. § 1229b(a):

> The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—
>
> (1) has been an alien lawfully admitted for permanent residence for not less than 5 years,
>
> (2) has resided in the United States continuously for 7 years after having been admitted in any status, and
>
> (3) has not been convicted of any aggravated felony.

The parties do not dispute that Guevara satisfied the first and third requirements. We are required here only to decide at what point Guevara has resided in the United States for a continuous period of seven years after being "admitted in any status." *See* 8 U.S.C. § 1229b(a)(2). The parties do not dispute that the approval of Guevara's adjustment of status would make him "admitted in any status." However, because his application for adjustment of status was approved on October 17, 2000, Guevara cannot meet the requirement of seven continuous years of living in the United States based on his date of adjustment. Therefore, we must decide whether Guevara

was "admitted in any status," when he received employment authorization from the United States Citizenship and Immigration Services (USCIS) on January 8, 1998 therefore providing him enough time for the requisite seven years.

While the phrase "admitted in any status" has not been defined, the term "admitted" has. *See* 8 U.S.C. § 1101(a)(13)(A) ("lawful entry . . . after inspection and authorization"). There is no dispute that Guevara does not meet the statutory definition of admitted, because he entered without inspection or authorization. *See Vasquez de Alcantar v. Holder*, ___ F.3d ___, Slip op. at 7412-13 (9th Cir. June 3, 2011). The phrase "admitted in any status," however, has not been limited to the strict definition of "admitted."[2] In *In re Rosas-Ramirez*, 22 I. & N. Dec. 616, 619 (B.I.A. 1999), the BIA held that the term "admitted" included those who are "lawfully admitted for permanent residence." *See also Matter of Koljenovic*, 25 I. & N. Dec. 219 (B.I.A. 2010). Again, in *Cuevas-Gaspar v. Gonzales*, we held that, for purposes of satisfying the seven years of continuous residence, a parent's LPR status is imputed to unemancipated minor children for purposes of "admission." 430 F.3d 1013, 1029 (9th Cir. 2005). Lastly, in *Garcia-Quintero*, we held that participation in the FUP was equivalent to being "admitted in any status." 455 F.3d at 1018-19. However, Guevara's situation is not directly analogous to any of these cases.

Regardless, Guevara argues that we should include aliens who are granted employment authorization in the definition of "admitted in any status." He argues that the employment authorization is the equivalent of the FUP acceptance held to constitute admission in *Garcia-Quintero*, because he was authorized by the government to stay in the United States

---

[2]We note, however, that the Eleventh Circuit recently held for purposes of waiver of removal under § 212(h), that the term "admitted" was limited to the statutory definition of 8 U.S.C. § 1101(a)(13)(A). *Lanier v. Holder*, 631 F.3d 1363, 1366 (11th Cir. 2011).

pending the approval of his application for adjustment of status. He argues that the fact that he was not allowed to leave the United States when he requested advanced parole is further evidence that this allowance granted him some status.[3] We disagree. According the BIA limited deference under *Skidmore*, we conclude that (1) a mere grant of employment authorization does not, without more, confer status; (2) employment authorization is not equivalent to participation in the FUP; and (3) the term "unauthorized alien" only refers to the eligibility to legally work, not to admission status.

*Skidmore Deference*

Because the BIA has not issued a precedential opinion on whether the receipt of an employment authorization document equates to admission, we need not accord the agency *Chevron* deference. *See Garcia-Quintero*, 455 F.3d at 1012-13. In this case, the BIA issued a unpublished, nonprecedential decision finding that "the starting date for [Guevara's] accumulation of seven years of continuous physical presence . . . should not begin on January 8, 1998, when . . . DHS[ ] issued him an employment authorization document . . . . Rather, we conclude that the starting date for [Guevara's] accumulation of seven years of continuous physical presence was on October 18, 2000, the date on which [his] application for adjustment of status was approved . . . ." The BIA found that the holding in *Garcia-Quintero*, "does not extend to an alien who was simply granted an [employment authorization document]," because Guevara's "circumstances are distinct from a FUP beneficiary." Although we find the BIA's conclusions persuasive, its decision lacks a thorough and meaningful analysis. Thus, we only accord the BIA decision some deference under *Skidmore*. *See Shin v. Holder*, 607 F.3d 1213, 1219 (9th Cir.

---

[3]Guevara does not argue that the denial of advanced parole provided him status. Thus, we do not address it here. We nevertheless note that applying the date of denial would not have provided the requisite seven years (September 29, 1999 to September 17, 2006).

2010) ("[T]he weight of the Board's decision depends on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). With this limited deference in mind, we analyze whether Guevara's employment authorization constituted admission "in any status."

**1.  *Grant of employment authorization does not constitute "admission in any status"***

**[2]** Guevara was granted authorization to accept employment pending the adjudication of his adjustment of status application pursuant to 8 C.F.R. § 274a.12(c)(9). Regulation 8 C.F.R. § 274a.12 sets forth the classes of aliens authorized to accept employment. The main three classes of aliens are: (a) "Aliens authorized employment incident to status;" (b) "Aliens authorized for employment with a specific employer incident to status;" and (c) "Aliens who must apply for employment authorization." 8 C.F.R. § 274a.12. Subsection (a) lists classes of aliens who are authorized employment *incident to status*. § 274a.12(a). This employment authorization is granted without restriction. *Id*. All of the aliens described in this section are either "admitted" or "granted" status. *See* 8 C.F.R. §§ 274a.12(a)(1) -(20). A sample of this group includes (1) aliens who have been granted asylum, § 274a.12(a)(5); (2) any alien granted Temporary Protected Status, § 274a.12(a)(12); and (3) any alien granted FUP benefits, § 274a.12(a)(14).

Subsection (c) similarly allows aliens to receive employment authorization. However, these aliens are not granted authorization "incident to status," but must instead apply for employment authorization. § 274a.12(c). Aliens listed in this class may or may not have any legal status. For example, this class of aliens includes (1) aliens (like Guevara) applying for adjustment of status, § 274a.12(c)(9); (2) aliens against whom

a final order of removal exists, but who cannot be removed due to the refusal of all designated countries, § 274a.12(c)(18); and (3) aliens applying for Temporary Protected Status, § 274a.12(c)(19).

**[3]** As noted above, 8 C.F.R. § 274a.12(c)(9) specifically allows adjustment of status applicants, such as Guevara, to request employment authorization while their application is pending. 8 C.F.R. § 274a.12(c)(9). However, the authorization for such employment is not mandated. 8 C.F.R. § 274a.13(a)(1). Instead, the USCIS grants such authorization "within [its] discretion." Id. Applicants under § 274a.12(c) may also have their grant of employment authorization terminated or revoked at any time under the criteria set forth in 8 C.F.R. § 274a.14, which includes, but is not limited to: (1) a preset expiration date; (2) initiation of deportation proceedings; (3) a showing of good cause; or (4) a showing that the information in the application is not true and correct. 8 C.F.R. § 274a.14(a)-(b).

**[4]** The language in the statute and the regulations authorizing employment do not support the proposition that aliens provided this benefit are "admitted in any status." There is no language in the statute or regulations that suggests aliens, not previously admitted, become "admitted," when they are granted employment authorization under 8 C.F.R. § 274a.12(c). There is nothing in case law, statutes, or administrative regulations which supports a finding that a grant of employment authorization (to an alien not previously admitted) is the equivalent to being admitted. As noted, § 274a.12 allows several classes of aliens to apply for employment authorization. While subsection (a) applies exclusively to aliens who have been admitted or granted status and states the authorization is "incident to status," subsection (c) does not. Guevara falls under subsection (c). The class of aliens to which Guevara belongs is not necessarily admitted nor has it necessarily obtained lawful status. Without a clear mandate

from Congress, we decline to extend the definition of "admitted in any status" in this instance.[4]

## 2.  *Employment authorization is not equivalent to FUP participation*

We decline to extend the reasoning of *Garcia-Quintero*, which addressed FUP beneficiaries, to all aliens who receive employment authorization.[5] Mere employment authorization for adjustment of status applicants is not comparable to participation in the FUP. Further, the employment authorization for the two classes of aliens is not similar.

[5] As we discussed in Vasquez de Alcantar, the FUP was enacted by Congress to assist a very narrow group of aliens. *Vasquez de Alcantar*, Slip op. at 7420. In doing so, it set forth

---

[4]Our dissenting colleague argues that, because the end result for both classes of aliens is largely equivalent, that status is conferred (albeit not necessarily equally) when employment is authorized. Dissent at 7400-01 ("It may be that those who are able to satisfy FUP entrance criteria enjoy a more privileged status . . . ."). While the employment authorization may provide some type of "authorization" or "status" for an alien to temporarily remain in the United States pending his application for adjustment of status, this benefit is not an admission. *See, e.g.*, *United States v. Bazargan*, 992 F.2d 844, 848 (8th Cir. 1993) (rejecting alien's argument that a grant of employment authorization as a consequence of his asylum petition made him a legal alien for purposes of 18 U.S.C. § 922(g)(5)); *United States v. Orellana*, 405 F.3d 360, 370 (5th Cir. 2005) ("Receipt of temporary benefits such as employment authorization or a temporary stay of removal does not render an otherwise illegal alien's presence lawful."). This temporary authorization to remain in the United States exists regardless of whether an alien is given the right to work but it is not equivalent to being admitted. *See, e.g.*, *United States v. Ochoa-Colchado*, 521 F.3d 1292, 1298 (10th Cir. 2008) ("[T]here is a distinction to be drawn between tolerating an alien's presence for a limited purpose and legalizing an alien's presence.").

[5]We do not address the effect of the BIA's decision in *Matter of Reza-Murillo*, 25 I. & N. Dec. 296 (B.I.A. 2010), which rejected this court's reasoning in *Garcia-Quintero*. Furthermore, the parties do not argue that we must defer to the agency's reinterpretation of "admitted in any status."

heightened requirements for eligibility. *Id.* at 7420-21. The FUP was enacted to prevent the separation of families and to provide a means by which a qualifying family member (already in the United States in illegal status) could eventually apply for permanent resident status. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301. In contrast, Congress did not have the same familial concerns in enacting the legislation permitting a nonimmigrant to adjust his or her status to that of a person admitted for permanent residence under 8 U.S.C. § 1255. It allowed aliens, who met certain criteria (work, family, or otherwise), to apply for adjustment of status. However, 8 U.S.C. § 1255 does not entitle aliens, who entered without inspection, to any admission "status" by reason of their application alone. *See Vasquez de Alcantar*, Slip op. at 7417-18.

**[6]** Generally, aliens must have lawful status prior to applying for adjustment of status. Congress, however, made an exception for those aliens who entered without inspection. *See* 8 U.S.C. § 1255(i). Section 1255(i) allows aliens (such as Guevara), who were not previously admitted, to apply for adjustment if they were the beneficiary of a visa petition filed before April 30, 2001. *Id.* This exception, however, only confers the right to apply. It does not suggest that the undocumented alien becomes admitted due to the mere filing of the application. If Congress intended for a status to be conferred at the time of filing, it could have easily done so. Thus, merely allowing all applicants (regardless of status) to work while seeking adjustment cannot, without more, equate to admission.

As we noted in *Vasquez de Alcantar*, in order for aliens to be allowed to participate in the FUP, they must meet heightened eligibility requirements. Slip op. at 7420-21. In return, they also have benefits that are not available to applicants for adjustment of status. *Id.* While both groups are able to work, the FUP provides additional benefits, most notably protection from removal for a renewable two-year period (i.e., voluntary

departure[6]). *See* Pub. L. No. 101-649 § 301; *Garcia-Quintero*, 455 F.3d at 1009. This benefit is not available to aliens with pending adjustment of status applications. *See* 8 U.S.C. § 1255. These differences in both eligibility and benefits are important in our consideration of whether to extend admission status beyond that set forth in 8 U.S.C. § 1101(a)(13)(A).

**[7]** In *Garcia-Quintero*, our decision to allow FUP participants to qualify as admitted in any status was not based upon the fact that FUP participants were allowed to work. 455 F.3d 1015-18. Our decision instead focused on the aliens' *acceptance* into the FUP. *Id.* at 1015. As part of that acceptance, we looked at Garcia-Quintero's enrollment in the program, specifically noting that it provided protection from deportation and that FUP beneficiaries "shall be inspected and *admitted* in the same immigration *status* as the alien had at the time of departure." *Id.* at 1017-18 (emphases in the original). A review of these eligibility requirements and resulting benefits (as a whole) supported our conclusion that Congress intended that FUP beneficiaries be "accorded a limited immigration status." *Id.* at 1018 & n.9. However, we have never discussed each of those individual benefits and concluded that each would be an independent basis for admission status. We again decline to find that grant of one of those benefits — employment authorization — is equivalent to participation in the FUP and thus an independent basis for admission status.

However, even if the individual benefit of employment authorization for FUP beneficiaries were compared to Guevara's employment authorization, they are far from the same authorization. If the agency intended the benefit to be the

---

[6]The grant of FUP voluntary departure is not the same as voluntary departure defined under 8 U.S.C. § 1229c. "Unlike the removal context, in which voluntary departure focuses on the alien's leaving the United States due to his removability, FUP voluntary departure focuses on the alien's staying in the United States while he adjusts his status to LPR." *Garcia-Quintero*, 455 F.3d at 1017-18.

same, there was no need to separate the aliens into classes. *Compare* 8 C.F.R. § 274a.12(a)(12) *with* § 274a.12(c)(19) (separating classes for aliens granted Temporary Protected Status versus aliens applying for Temporary Protected Status). FUP beneficiaries are designated under subsection (a), which authorizes employment "incident to status," 8 C.F.R. § 274a.12(a), whereas Guevara's employment authorization was under subsection (c), which requires aliens to apply for authorization, § 274a.12(c). Subsection (a), unlike subsection (c) (as noted above), does not provide for any discretion in granting or denying employment authorization, because such aliens are allowed such authorization incident to their status. *See* 8 C.F.R. § 236.15(d) ("An alien granted benefits under the Family Unity Program *is authorized* to be employed in the United States and *will receive* an employment authorization document." (emphasis added)). Moreover, unlike applicants under subsection (c), the USCIS cannot terminate employment authorization for FUP beneficiaries or others aliens included under subsection (a). *See* 8 C.F.R. § 274a.14. Thus, the regulations set forth that the employment authorization between the classes is distinct from each other.

We decline to interpret a commonality among these different classes of aliens merely due to the possible end result — a grant of a work permit. Thus, we conclude that, even looking at this isolated benefit, there is no support for concluding that Congress intended to make a whole class of aliens (not inspected or authorized) "admitted" by the mere grant of an employment authorization.

Our dissenting colleague points to the BIA's decision in *Matter of Blancas-Lara*, 23 I.&N. Dec. 458 (BIA 2002), which holds that a nonimmigrant who was admitted to the United States with a 72 hour border crossing card has satisfied the requirement of having been "admitted in any status" for the purposes of accruing the 7 years residency requirement needed for cancellation of removal. *Id.* 459-60. The dissent contends that it is "illogical" to allow such accrual of over-

stayed time and deny accrual for undocumented immigrants like Guevara who have work permits while waiting for adjustment of status under 8 U.S.C. § 1255(i). The dissent overlooks the key distinction, which is that Blancas-Lara satisfied the statutory requirement of having been "admitted" by "lawful entry . . . after inspection and authorization." *See Matter of Blancas-Lara*, 23 I.&N. Dec. at 459-60 (citing 8 U.S.C. § 1101(a)(13)(A)). Here, the dissent does not dispute that Guevara did not meet the statutory definition of "admitted" under § 1101(a)(13)(A).

Although Blancas-Lara was unlawfully present in the United States after his border crossing card expired, Congress in 28 U.S.C. § 1229b(a)(2) did not include maintenance of status as a prerequisite for relief. Rather, as the BIA in *Blancas-Lara* recognized, "it chose only to require 7 years of continuous residence after admission to the United States." 23 I.&N. Dec. at 460.

There is nothing illogical about distinguishing between Blancas-Lara, who was lawfully admitted to the United States, from Guevara, who entered without inspection and authorization and received employment authorization while awaiting lawful status.

### 3. *The term "unauthorized alien" does not suggest admission*

[8] Lastly, it seems that Guevara argues that the plain language of the 8 C.F.R. § 274a.12(c)(9) provides status. Guevara argues that the employment authorization provides status, in part, based upon the language that "an alien will not be deemed to be an 'unauthorized alien.' "[7] *See* 8 C.F.R.

---

[7]An "unauthorized alien," under 8 U.S.C. § 1324a(h)(3), "means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."

§ 274a.12(c)(9). This argument is not correct. This language does not provide any admission status. Rather, it merely allows an employer to legally hire an alien (whether admitted or not) while his application is pending. *See, e.g.*, 8 U.S.C. § 1324a. We find nothing in the statute or administrative regulation to provide for more.

**PETITION FOR REVIEW DENIED.**

FISHER, Circuit Judge, dissenting:

I respectfully dissent. In my view, under *Garcia-Quintero v. Gonzales*, 455 F.3d 1006 (9th Cir. 2006), Guevara was "admitted in any status" for purposes of 8 U.S.C. § 1229b(a)(2) when the government exercised its discretion to grant his application for employment authorization. The Immigration Judge (IJ) correctly applied *Garcia-Quintero* in concluding that Guevara is eligible for cancellation of removal. I would grant the petition for review and remand for entry of an order cancelling removal, consistent with the IJ's decision.

**I.**

Section 1229b(a) allows the Attorney General to cancel removal for aliens who (1) have accrued five years in legal permanent resident (LPR) status, (2) have "resided in the United States continuously for seven years after having been admitted in any status," and (3) have not been convicted of any aggravated felony. At issue here is whether and when Guevara was "admitted in any status" for purposes of § 1229b(a)(2). I would hold he received such an admission when he was granted an employment authorization benefit that is functionally very similar to the Family Unity Program (FUP) acceptance held to constitute § 1229b(a)(2) admission in *Garcia-Quintero*, 455 F.3d at 1018-19.

I recognize that applicable regulations provide some basis for distinguishing FUP beneficiaries from applicants for adjustment of status under Immigration and Nationality Act § 245(i), 8 U.S.C. § 1255(i), like Guevara. Whereas 8 C.F.R. § 274a.12(a) makes FUP participants automatically eligible for work authorization "incident to status," subsection (c) of that regulation requires applicants for adjustment of status to apply for employment authorization. But the majority's reliance on this distinction misses the point. *See* Maj. Op. at 7392-94. The issue is not whether Guevara received employment authorization as a result of some existing status. This case instead presents the converse question: whether status was conferred on Guevara as a result of the discretionary grant of employment authorization.

I would hold that it was. Once employment authorization is granted under § 274a.12(c), it is largely equivalent to the § 274a.12(a) authorization to which FUP participants are entitled: it allows the holder to live and work in the United States openly and lawfully while his application for adjustment of status is processed. Thus, although the employment authorization Guevara received is formally distinguishable from the employment authorization available to FUP beneficiaries, Guevara's authorization was substantially comparable to the FUP benefit. Both the benefit Guevara received and the similar benefit available through the FUP implicitly authorize temporary residency pending final resolution of the beneficiary's application to adjust status.

The majority distinguishes FUP beneficiaries from other § 245(i) applicants by pointing to the relatively stringent FUP entrance criteria. *See* Maj. Op. at 7394-95. But the majority does not explain how these heightened requirements for FUP acceptance differentiate those ultimately allowed into the program from applicants who are granted similar benefits. Differences in program entrance criteria are of little import after the agency has exercised its discretion to grant the applicant benefits. It may be that those who are able to satisfy FUP

entrance criteria enjoy a more privileged status than that of § 245(i) applicants granted work authorization, by virtue of having passed through a more stringent selection process and having received greater benefits. "Any" status is acceptable for purposes of § 1229b(a)(2), however. *Cf. United States v. Ochoa-Colchado*, 521 F.3d 1292, 1298 (10th Cir. 2008) (acknowledging that even if employment authorization does not make an alien's presence legal, "[a]n alien who has filed for adjustment of status and received an [employment authorization document] may in some sense be 'authorized' to be in the United States, inasmuch as he is granted a temporary reprieve from removal proceedings and permitted to work here pending the outcome of his case").

I also recognize that FUP regulations allowing travel abroad are more permissive than those governing advance parole of § 245(i) applicants like Guevara, as was pointed out in *Vasquez de Alcantar v. Holder*, No. 08-71427, filed concurrently with this opinion. *See Vasquez de Alcantar* at 7422-23.[1] Unlike a non-FUP applicant, a FUP program participant may travel outside the United States and will upon return be "admitted in the same immigration status as the alien had at the time of departure." 8 C.F.R. § 236.16. Non-FUP applicants, by contrast, must apply for advance parole before they may travel abroad, and the grant of advance parole does not itself constitute an admission. *See* 8 U.S.C. § 1182(d)(5)(A). The very existence of an advance parole application process implies that applicants like Guevara have a legal benefit they stand to lose, however. In Guevara's case, that benefit was significant: if he left the United States without permission, he risked being stripped of the employment authorization the agency affirmatively exercised its discretion to grant. Of course, given their more generous travel privi-

---

[1] As I noted in my concurrence in *Vasquez de Alcantar*, I do not read that opinion to address the issue in this case, so it does not foreclose the conclusion I urge here. *See Vasquez de Alcantar* at 7424 (Fisher, J., concurring).

leges, FUP beneficiaries may enjoy a more privileged status than that of non-FUP employment authorization holders like Guevara. However, that difference is irrelevant for purposes of § 1229b(a)(2), which does not distinguish among different sorts of status.

I am likewise unpersuaded that a grant of employment authorization cannot constitute admission in any status under *Yepez-Razo v. Gonzales*, 445 F.3d 1216, 1219 (9th Cir. 2006), also cited in *Vasquez de Alcantar*. *See Vasquez de Alcantar* at 20. *Yepez-Razo* recognized that after a FUP beneficiary is accepted into the program, the time the beneficiary spends in the program does not count as unlawful presence under 8 U.S.C. § 1182(h). *See Yepez-Razo*, 445 F.3d at 1218-20. As I explain further below, however, those who receive discretionary employment authorization benefits are also legitimately present, notwithstanding the lack of similar statutory language explicitly recognizing their lawful status.

In sum, the majority offers no convincing reason to distinguish this case from *Garcia-Quintero*. I would follow *Garcia-Quintero* by holding that the discretionary grant of an employment authorization constitutes § 1229b(a)(2) admission.

## II.

The majority's contrary conclusion — that undocumented § 245(i) applicants are not admitted in any status until their § 245(i) applications are approved — means that relatively minor differences in the circumstances of the applicant's entry into the United States dramatically alter the application of § 1229b(a)(2).

In *Matter of Blancas-Lara*, the BIA held that nonimmigrants whose presence in the United States was once legal, no matter how briefly, have been "admitted in any status." *See Matter of Blancas-Lara*, 23 I. & N. Dec. 458, 459-61 (B.I.A.

2002). *Blancas-Lara* concluded that a nonimmigrant who entered with a border crossing card allowing him to stay in the United States for 72 hours was admitted in any status at the time of his lawful entry, and that subsequent years during which the nonimmigrant remained in the United States illegally could be counted toward § 1229b(a)(2)'s seven-year requirement. *See Blancas-Lara*, 23 I. & N. Dec. at 459. It would be illogical to allow nonimmigrants who overstay their visas to accrue time toward the seven-year requirement during their unlawful presence whereas undocumented aliens who have been granted permission to work in the United States during the pendency of their § 245(i) applications cannot do the same. From a commonsense standpoint, the presence of a § 245(i) applicant who has been permitted to work in the United States is more legitimate than the unlawful presence of a nonimmigrant whose temporary visa has expired. But the majority's reasoning permits just such a result.

## III.

I recognize that the BIA disagreed with the reasoning of *Garcia-Quintero* in *Matter of Reza-Murillo*, 25 I. & N. Dec. 296 (B.I.A. 2010), although I leave for another day the reconciliation of *Garcia-Quintero* and *Reza-Murillo* under *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 982-83 (2005), which the government does not invoke. I do note, however, that I do not find persuasive *Reza-Murillo*'s insistence that "declining to treat a grant of FUP benefits as an 'admission' . . . does not create absurd or bizarre results." *Reza-Murillo*, 25 I. & N. Dec. at 299. *Reza-Murillo* does produce absurdities, by divorcing the accumulation of time toward the seven-year requirement from the apparent statutory goal of requiring accrual of legitimate presence. *See Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1027-28 (9th Cir. 2005) (concluding that the § 1229b(a)(2) requirement "was designed to [allow for] counting a limited period of time spent in non-permanent status"). As explained above, *Reza-Murillo* and *Blancas-Lara* allow aliens who entered

legally but soon after lapsed into illegal status to qualify for cancellation of removal, while denying cancellation relief to aliens like Guevara whose presence has long been recognized and accepted by the Attorney General.

\*\*\*

In sum, I would hold that, consistent with *Blancas-Lara* and *Garcia-Quintero*, Guevara was "admitted in any status" when the United States exercised its discretion to grant his application for employment authorization. Because he received such admission more than seven years before receiving a notice to appear, he was eligible for cancellation of removal, which the IJ exercised his discretion to grant. I would grant the petition for review and remand for reinstatement of the IJ's decision.